IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

FILED
IN OPEN COURT

OCT 2 6 2017

CLERK, U.S. DI....
ALEXANDRIA, VIR GIN......

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:17-CR-248 |
| | ) | |
| HYUNG KWON KIM, | ) | Hon. T. S. Ellis, III |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations contained in the Information and the following

Statement of Facts are true and correct, and that had the matter gone to trial, the United States

would have proven them beyond a reasonable doubt.

### INTRODUCTION

1.      Defendant Hyung Kwon Kim ("Defendant") was a citizen of the Republic of

Korea ("South Korea") and, since 1998, a legal permanent resident of the United States.

Defendant resided in the Commonwealth of Massachusetts from 1995 to 2004, and the State of

Connecticut from 2004 to the present.

2.      Person 1 was a citizen of South Korea and, since 2003, a citizen of the United

States. Person 1 resided in the Commonwealth of Massachusetts from 1995 to 2004, and the

State of Connecticut from 2004 to the present. Person 1 was the spouse of Defendant.

3.      Person 2 was a citizen and resident of South Korea. Person 2 was a relative of

Defendant.

4.      The Internal Revenue Service ("IRS") was an agency of the United States

Department of the Treasury responsible for administering the federal tax laws of the United

States, and collecting taxes owed to the United States.

5.      A Report of Foreign Bank and Financial Accounts, FinCEN Report 114 (formerly TD F 90.22-1) ("FBAR") was required to be filed with the Department of the Treasury by each U.S. taxpayer with a financial interest in or signature authority over one or more foreign financial accounts, the aggregate value of which exceeded $10,000 at any time during the calendar year reported.

6.      A Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding, Form W-8BEN ("W-8BEN") was required to be filed by each nonresident alien who is the beneficial owner of certain income received from United States sources.

7.      Credit Suisse AG ("Credit Suisse"), a corporation organized under the laws of Switzerland, directly and through its parent, subsidiaries and affiliates, operated a global financial services business. Credit Suisse offered private banking and wealth management services to customers around the globe, including U.S. citizens, legal permanent residents, and resident aliens located within the Eastern District of Virginia and elsewhere. In 2014, Credit Suisse pled guilty in the United States District Court for the Eastern District of Virginia to a charge of conspiracy to willfully aid, assist in, procure, counsel, and advise the preparation and presentation of false income tax returns and other documents to the IRS in violation of 26 U.S.C. § 7206(2), all in violation of Title 18, United States Code, Section 371. As part of a plea agreement with the United States Attorney's Office, Credit Suisse admitted that it willfully aided and assisted U.S. clients in opening and maintaining undeclared accounts and concealing their offshore assets and income from the IRS.

8.      Bank Leu AG ("Bank Leu") was a wholly owned subsidiary of Credit Suisse that operated as a private bank with offices in Zurich, Switzerland until 2007.

9.     Bank Hofmann AG ("Bank Hofmann") was a wholly owned subsidiary of Credit Suisse that operated as a private bank with offices in Zurich, Switzerland until 2007.

10.    Clariden Leu AG ("Clariden Leu") was a wholly owned subsidiary of Credit Suisse that operated as a private bank with offices in Zurich, Switzerland. In or around 2007, Credit Suisse formed Clariden Leu by merging together five of its wholly owned subsidiaries, including Bank Leu and Bank Hofmann. In or around 2012, Clariden Leu merged into Credit Suisse and out of existence.

11.    UBS AG ("UBS"), a corporation organized under the laws of Switzerland, directly and through its subsidiaries, operated a worldwide financial services business. UBS provided banking, wealth management, asset management and investment banking services, among other services, around the world, including through branches located in the United States. UBS previously entered into a Deferred Prosecution Agreement with the United States Attorney's Office for the Southern District of Florida, Case No. 09-60033-CR-COHN. As part of the Deferred Prosecution Agreement, UBS admitted that, beginning in 2000 and continuing until 2007, UBS, through certain private bankers and managers in the U.S. cross-border business, participated in a scheme to defraud the United States and its agency, the IRS, by actively assisting or otherwise facilitating a number of U.S. individual taxpayers in establishing accounts at UBS in a manner designed to conceal the U.S. taxpayers' ownership or beneficial interest in said accounts.

12.    Bank 1 was a private bank with offices in Zurich, Switzerland. In or around 2013, Bank 1 commenced proceedings to cease its operations.

13.    "Investment Advisory Firm" was a Swiss wealth and asset management firm with offices in Zurich, Switzerland.

14. Dr. Edgar H. Paltzer ("Paltzer"), a citizen of the United States and Switzerland and resident of Switzerland, practiced as an attorney in Switzerland. On or about August 16, 2013, Paltzer pled guilty in the United States District Court for the Southern District of New York to a Superseding Information charging him with a conspiracy to defraud the United States as well as a conspiracy to commit violations of 26 U.S.C. §§ 7201 and 7206(1), all in violation of Title 18, United States Code, Section 371.

15. Daroka Foundation ("Daroka") was a nominee entity organized and established in Lichtenstein by Paltzer that Defendant used to conceal assets and income from the IRS.

16. Daroka Overseas, Inc. ("Daroka Overseas") was a nominee entity organized and established in Panama by Paltzer that Defendant used to conceal assets and income from the IRS. Daroka Overseas was wholly owned by Daroka.

17. Edraith Invest & Finance Ltd. ("Edraith") was a nominee entity organized and established in the British Virgin Islands by Paltzer that Defendant used to conceal assets and income from the IRS. Edraith was wholly owned by Daroka.

18. "Banker 1" was a private banker at Bank Leu and, later, Clariden Leu, who worked in the Zurich, Switzerland office. Banker 1 managed accounts owned and/or controlled by Defendant from 1998 to 2008. Banker 1 joined Investment Advisory Firm in 2008. Although Banker 1's formal business relationship with Defendant ended in 2008, Banker 1 continued to assist in the management of Defendant's undeclared foreign financial accounts until their closure in 2012.

19. "Banker 2" was a private banker at Bank Hofmann and, later, Clariden Leu, who worked in the Zurich, Switzerland office. Banker 2 managed an account owned by Defendant from 2002 to 2008.

20.     Stefan Buck ("Buck") was a private banker at Bank 1 who worked in the Zurich, Switzerland office.  Buck managed accounts owned and/or controlled by Defendant from 2008 to 2012.

## CRIMINAL CONDUCT

For the calendar year 2007, Defendant did unlawfully, knowingly, intentionally and willfully fail to file an FBAR with the Department of the Treasury, in violation of Title 31, United States Code, Sections 5314 and 5322(b) and Title 31, Code of Federal Regulations, Section 103.24

21.     In or around 1998, Defendant traveled to Switzerland for the purpose of identifying Swiss financial institutions to open one or more accounts to receive funds that Person 2 had on deposit at financial institutions in Hong Kong.

22.     On or about October 7, 1998, Defendant opened, or caused to be opened, account xx-xx3-262 / xx-xxx7770 at Bank Leu in Zurich, Switzerland.  Defendant met with Banker 1 at Bank Leu and opened the account in his own name using his South Korean passport, the sole passport he possessed.  During the meeting, Defendant informed Banker 1 of the source of the funds, and further that Defendant was a legal permanent resident of the United States.  Defendant granted signature authority over the account to several family relatives.  At Banker 1's suggestion, Defendant instructed Bank Leu to retain all mail and not send it to his United States address.  Defendant funded the account with transfers from a Hong Kong bank account belonging to Person 2.

23.     On or about October 29, 1999, Defendant opened, or caused to be opened, account xxx-xxx924-1 at Credit Suisse in Zurich, Switzerland.  Defendant opened the account in his own name.  Defendant followed the directions provided by Credit Suisse to check the box

that permitted the bank to retain his mail, and not to send it to Defendant's United States address. Defendant funded the account with transfers from a Hong Kong bank account belonging to Person 2.

24. In or around October 2000, Defendant met with Banker 1 at the offices of Bank Leu in Zurich, Switzerland. As was common with many such offshore tax accounts, Banker 1 offered Defendant an account in the name of a nominee offshore entity for the purpose of holding the U.S. securities in that account. Defendant further followed Banker 1's suggestion and agreed to a number of actions to ensure that he could continue to invest in U.S. securities in his undeclared foreign financial accounts while concealing his identity from U.S. law enforcement, including the following:

a. On or about October 20, 2000, Defendant signed an instruction provided by Credit Suisse that stated that Defendant did not authorize the bank to disclose his identity to the IRS and, instead, to sell all U.S. securities in account xxx-xxx924-1.

b. On or about October 24, 2000, Defendant opened, or caused to be opened, account xxx-xx0009, a numbered account, at UBS in Zurich Switzerland. UBS recorded Defendant as the beneficial owner of the assets of the account and as a citizen of South Korea. On or about the same date, Defendant granted general power of attorney over the account to certain relatives. Also, at UBS's suggestion, Defendant provided instructions to UBS to retain all mail, and not to send it to his United States address. Defendant used the UBS account to invest in, among other things, U.S. securities.

c. On or about October 25, 2000, Banker 1 brought Defendant to Edgar Paltzer's law office in Zurich, Switzerland for the purpose of creating a nominee entity and opening a financial account in such nominee's name in order to continue the concealment of

Defendant's undeclared assets. Defendant, Paltzer and Banker 1 met for an extensive period of time. During that time, they discussed Defendant's financial assets, business relationships and family structure, as well as various mechanisms for establishing a nominee owner of Defendant's offshore assets. Paltzer had a stack of documents with different entity names which could be used. Defendant selected Daroka and Daroka Overseas as entities to hold his nominee accounts. Paltzer suggested and Defendant agreed that Daroka and Daroka Overseas be established. Paltzer served as a nominal director of Daroka and as the nominal president of Daroka Overseas.

25.     On or about November 30, 2000, Defendant opened, or caused to be opened, account xxxx-xx2405 at Bank Leu in the name of Daroka Overseas, which account included various sub-accounts and a line of credit. Defendant signed an instruction directing Banker 1 to transfer funds from his existing Bank Leu account, account xx-xx3-262 / xx-xxx7770, to the Daroka Overseas account. Even though Paltzer served as the nominal director of Daroka, Defendant dealt primarily with Banker 1 by issuing instructions for Banker 1 to purchase or sell certain U.S. securities or to withdraw cash.

26.     On or about February 5, 2002, Defendant, Person 1, and Banker 1 met with Paltzer at his office in Zurich at which time Paltzer explained the Daroka nominee structure.

27.     On or about February 5, 2002, Defendant caused Credit Suisse to close account xxx-xxx924 and transfer the contents to other accounts that he held in Switzerland.

28.     On or about February 5, 2002, Defendant and Banker 1 caused Bank Leu in Zurich, Switzerland to open account xxxx-xxx244-6 held in the name of Person 1. Defendant signed documents providing certain relatives with power of attorney over the account. Defendant caused Person 1 to sign a form instructing Bank Leu to retain all mail, and not to send

it to Person 1 in the United States. Defendant funded the account with transfers from the Daroka Overseas account at Bank Leu.

29.     On or about February 8, 2002, Defendant opened, or caused to be opened, account xxxx-xx9709 at Bank Hofmann in the name of Daroka Overseas. On or about that date, Defendant caused a false W-8BEN to be submitted to Bank Hofmann, which was false in that it did not disclose that Defendant was the beneficial owner of the assets in said account. Defendant initially funded the account with transfers from the Daroka Overseas account at Bank Leu.

30.     Between 2000 and 2008, Defendant usually traveled annually to Switzerland. On each trip, Defendant met with Banker 1 to discuss his accounts at Bank Leu. In addition, Banker 1 also made trips to the United States to meet with Defendant and to discuss Defendant's accounts. From 2002 to 2008, Defendant met with Banker 2 to discuss his account at Bank Hofmann. When not in Switzerland, Defendant communicated with Banker 1 and Banker 2 via telephone, facsimile and email from the United States.

31.     Defendant used the funds in his undeclared foreign financial accounts in Switzerland to finance a portion of the purchase of his residence in the United States in the following manner:

     a.     On or about September 15, 2003, Defendant caused Banker 2 to have Bank Hofmann issue a check in the amount of $50,000 payable to a third party to fund the purchase.

     b.     On or about November 20, 2003, Defendant caused Banker 2 to have Bank Hofmann issue a check in the amount of $50,000 payable to a third party to fund the purchase of his residence. Banker 2 warned Defendant that making payments in U.S. dollars

through a U.S. bank could cause his ownership and control of the Daroka account to be revealed. Defendant informed Banker 2 that Paltzer had advised him of the risks.

   c.  On or about December 11, 2003, Defendant caused Paltzer to instruct Banker 1 to have Bank Leu issue a check in the amount of $701,500 payable to a third party to fund the purchase and to send that check via Federal Express to Defendant's residence in the United States.

   d.  In or around January 2004, Defendant closed on the purchase of the home in Greenwich, Connecticut. Defendant took out a mortgage in order to finance a portion of the purchase.

   e.  On or about September 29, 2004, Defendant sent a hand-written letter via facsimile to Paltzer instructing him to direct Banker 1 to have Bank Leu issue a check in the amount of $1.76 million in order pay off a portion of the mortgage on the Greenwich, Connecticut home. With respect to these matters, Defendant communicated in a manner designed to conceal his ownership of his foreign financial accounts. On this same day, Paltzer sent a letter to Banker 1 requesting that funds from the Daroka Overseas account at Bank Leu be used to purchase the check. In order to conceal Defendant's ownership and control of the Daroka Overseas account, Paltzer directed Banker 1 to have the check issued by Credit Suisse First Boston, which at that time was the investment banking division of Credit Suisse doing business in the United States.

   f.  On or about May 24, 2007, Defendant caused Banker 1 to have Bank Leu issue a check in the amount of $495,000 in order pay off the mortgage on the Greenwich, Connecticut home.

32.     In or around November 2005, Defendant decided to buy a waterfront home on Stage Harbor in Chatham, Massachusetts for $4.75 million. After discussing the matter with Defendant, Paltzer recommended that Defendant utilize an offshore entity, other than Daroka Oversea, to hold title to the house.  Paltzer established Edraith to acquire title to the property and to conceal Defendant's owners of the property and of the offshore account.   Although Defendant intended to reserve the property for his exclusive use, he and Paltzer communicated about the property in a manner that created the appearance that Defendant was renting the property from a fictitious owner.

33.     In or around November 2005, Paltzer caused Banker 1 to open account xxxx-xx4608 at Bank Leu in the name of Edraith.  Defendant caused the transfer of funds into the newly opened Edraith account in order to pay for the purchase of the Stage Harbor home including $3 million from the Daroka Overseas account at Bank Hofmann and $1.855 million from the Daroka Overseas account at Bank Leu.  Defendant ultimately caused the transfer of over $4.8 million to an attorney's IOLTA account in the United States to purchase the home.

34.     Defendant used the funds in his undeclared accounts at Bank Leu and Bank Hofmann to finance the purchase of jewelry, jewelry settings, loose gems and pearls.  For example:

a.     On or about April 23, 2003, Defendant withdrew $80,000 in cash from the Daroka Overseas account at Bank Hofmann in order to purchase jewelry.

b.     On or about March 1, 2005, Defendant withdrew $300,000 from the Daroka Overseas account at Bank Hofmann in the form of a check made payable to a jeweler in Greenwich, Connecticut for the purchase of  an 8.4 carat emerald ring.

c. On or about March 7, 2005, while traveling in Japan, Defendant arranged for Banker 2 to wire transfer $86,000 to a Japanese jewelry company for the purchase of pearls.

d. On or about May 10, 2005, Defendant sent an email to Banker 1, instructing Banker 1 to have Bank Leu issue a check in the amount of $370,000 payable to a jeweler in Greenwich, Connecticut for the purchase of a 7.15 carat diamond ring.

e. On or about February 15, 2006, Defendant purchased an 11.6 carat diamond ring from a jeweler in Greenwich, Connecticut. Defendant financed the purchase with at least three checks made payable to the jeweler and funded by withdrawals from the Daroka Overseas account at Bank Hofmann including: two checks for $200,000 (obtained September 30, 2005 and November 18, 2005) and a check for $730,000 (obtained February 15, 2006).

f. In or around September 2006, Defendant withdrew $860,000 from the Daroka Overseas account at Bank Hofmann, in the form of checks made payable to a jeweler in Greenwich, Connecticut in the amounts of $390,000 and $470,000, for the purchase of a 10.5 carat yellow diamond ring and jewelry setting.

g. On or around September 13, 2006, Defendant met with Paltzer at the Four Seasons Hotel in New York, New York and discussed Defendant's undeclared accounts.

h. On or about March 25, 2008, Defendant, with the assistance of Banker 1 and Paltzer, withdrew $2.2 million from the Daroka Overseas account at Bank Leu, in the form of checks made payable to a jeweler in Greenwich, Connecticut in the amounts of $553,000, $780,000 and $870,000, for the purchase of an 8.6 carat ruby ring.

35. In or around December 2005, Defendant, with the assistance of Banker 1 and Paltzer, used some of the funds in the Daroka Overseas account at Bank Leu to contribute $500,000 to an Ivy League university. Via email and telephone calls, Defendant instructed

Banker 1 to issue checks payable to the university in the amounts of $230,000, $230,000 and $40,000.

36. Defendant withdrew substantial amounts from the Daroka Overseas account at Bank Leu by telephoning Banker 1 and directing Banker 1 to wire funds to accounts he controlled at a financial institution in the United States including transfers of $25,000 and $26,000 on April 9, 2001.

37. Defendant withdrew substantial amounts of cash from his undeclared accounts at Bank Leu, Credit Suisse and Bank Hofmann by making periodic withdrawals in various currencies directly from the respective banks at their premises in Zurich, including the approximate amounts set forth in the following table:

| Date | Bank | Account | Amounts Withdrawn |
|------|------|---------|-------------------|
| 8/7/2000 | Bank Leu | xx-xx3-262/xx-xxx7770 | $49,500 |
| 8/8/2000 | Bank Leu | xx-xx3-262/xx-xxx7770 | $49,500 |
| 9/11/2000 | Bank Leu | xx-xx3-262/xx-xxx7770 | $49,500 |
| 2/5/2002 | Bank Leu | xxxx-xx2405 | $11,922 |
| 2/8/2002 | Bank Leu | xxxx-xx2405 | $4,493 |
| 3/12/2002 | Bank Leu | xxxx-xx2405 | $50,000 |
| 4/26/2002 | Bank Leu | xxxx-xx2405 | $50,000 |
| 12/23/2002 | Bank Hofmann | xxxx-xx9709 | $29,756 |
| 4/23/2003 | Bank Hofmann | xxxx-xx9709 | $110,000 |
| 11/14/2003 | Bank Hofmann | xxxx-xx9709 | $7,000 |
| 3/8/2004 | Bank Hofmann | xxxx-xx9709 | $50,000 |
| 11/18/2004 | Bank Leu | xxxx-xx2405 | $25,536 |
| 11/18/2004 | Bank Hofmann | xxxx-xx9709 | $17,536 |
| 6/16/2005 | Bank Hofmann | xxxx-xx9709 | $25,231 |
| 6/16/2005 | Bank Leu | xxxx-xx2405 | $16,292 |
| 6/20/2005 | Bank Leu | xxxx-xx2405 | $7,917 |
| 2/5/2007 | Clariden Leu (former Bank Hofmann) | xxxx-xx9709 | $23,000 |
| 7/2/2008 | Clariden Leu (former Bank Leu) | xxxx-xx2405 | $31,443 |
| 7/3/2008 | Clariden Leu (former Bank Leu) | xxxx-xx2405 | $3,964 |

38.     In or around November 2008, during a visit by Defendant to Zurich, Switzerland,
Banker 1 informed Defendant that, due to ongoing United States investigations, Clariden Leu
intended to close the accounts of United States clients with undeclared money and United States
securities. Banker 1 gave Defendant three options: bring the money to the United States and
disclose its existence to the U.S. government; spend the money; or move the money to another
foreign financial institution.

39.     In or around November 2008, Defendant and Banker 1 met with Paltzer at his
office, whereupon Paltzer repeated the three options to Defendant. Paltzer informed Defendant
that Paltzer could open an account for Defendant at Bank 1, which was still opening accounts for
United States clients with undeclared money. Defendant ultimately elected to move the funds to
Bank 1.

40.     Around this time, Paltzer advised Defendant to limit communications in order to
remain discreet. For example, Paltzer warned Defendant against using email or making frequent
telephone calls. Paltzer also cautioned Defendant to refrain from calling Paltzer from the United
States, and, instead, recommended that Defendant telephone Paltzer from Central America when
Defendant was traveling on business. Paltzer also suggested to Defendant that they meet in
either France or Italy, instead of Zurich.

41.     On or about December 17, 2008, Defendant opened, or caused to be opened, at
Bank 1 account xx-xxx774-3 in the name of Daroka Overseas and account xx-xxx206-2 in the
name of Edraith. Defendant, with the assistance of Paltzer and Buck, subsequently caused all
funds held in his undeclared accounts at Clariden Leu to be transferred to the newly opened
accounts at Bank 1.

42.     On or around March 13, 2009, Defendant went to the offices of Bank 1 and was met in person by Buck. Buck offered to help Defendant with Defendant's accounts at Bank 1, which were nominally held by Daroka Overseas and Edraith, respectively, and which contained Defendant's undeclared money.

43.     In or around July 2008, Banker 1 left Clariden Leu and joined Investment Advisory Firm. Though Defendant and Banker 1 no longer maintained a formal business relationship, Banker 1 continued to facilitate Defendant's access to the assets concealed in the Daroka Overseas and Edraith accounts at Bank 1 by acting as an intermediary between Defendant, Paltzer, and Buck.

44.     In or around June and September 2009, Buck sent e-mails to Client 3's U.S.-based email address.

45.     Defendant withdrew substantial amounts of cash from his undeclared accounts at Bank 1 through periodic withdrawals in various currencies. Prior to traveling to Switzerland, Defendant would advise Banker 1 of the amounts that he wished to receive. In turn, Banker 1 relayed the request to Paltzer. Paltzer sent his assistant to withdraw the cash from Bank 1, transport it to Paltzer's office, and store it in Paltzer's safe until Defendant traveled to Zurich to receive cash. Kim received the following amounts on the following dates in this manner:

| Date | Amounts Withdrawn |
| --- | --- |
| 3/13/2009 | $25,500 |
| 7/2/2009 | $50,681 |
| 3/3/2011 | $37,950 |
| 8/15/2011 | $62,699 |
| 8/22/2011 | $5,418 |

46.     In or around 2011, Banker 1, Paltzer and Defendant agreed to deplete the funds from the accounts at Bank 1 by using the funds to purchase jewelry and jewels that could be delivered in the United States.

47.     With the help of a Greenwich, Connecticut jeweler, Defendant agreed to purchase a 13.9 carat sapphire ring from a New York jeweler. Defendant arranged to pay for the ring – as well as a 15% commission for the Greenwich, Connecticut jeweler – by transferring funds from the Daroka Overseas account to the Swiss account of a jeweler in Geneva, Switzerland. The Greenwich, Connecticut jeweler arranged to have the ring delivered to the jeweler's business premises in Connecticut where Defendant would take delivery.

48.     In or around March 2011, in order to effectuate the purchase of the sapphire ring, Defendant used, or caused Person 1 to use, the mails to send to Banker 1 in Switzerland a gift package which contained hand-written wire transfer instructions. Banker 1 forwarded the hand-written instructions to Paltzer on the letterhead of Investment Advisory Firm.

49.     On or about April 26, 2011, Paltzer sent an instruction to Buck at Bank 1 directing the bank to transfer just under $1.9 million from the Daroka Overseas account to the Swiss account of a Geneva-based jeweler.

50.     In or around August 2011, Defendant agreed with the Greenwich, Connecticut jeweler to purchase three loose diamonds (5.02 carats, 4.03 carats and 4.17 carats) for approximately $1.7 million from a New York Jeweler. Defendant arranged to pay for the diamonds – as well as a 15% commission for the Greenwich, Connecticut jeweler – by transferring funds from the Daroka Overseas account to the Swiss account of a jeweler in Geneva, Switzerland. The Greenwich, Connecticut jeweler arranged to have the diamonds

delivered to the jeweler's business premises in Connecticut where Defendant would take delivery.

51. In or around August 2011, Defendant used, or caused Person 1 to use, the mails to send to Banker 1 in Switzerland a gift package which contained hand-written wire transfer instructions. Banker 1 forwarded the hand-written instructions on the letterhead of Investment Advisory Firm to Paltzer.

52. On or about August 5, 2011, Paltzer sent an instruction directing Buck at Bank 1 to wire transfer approximately $1.7 million from the Daroka Overseas account to the Swiss account of a Geneva-based jeweler.

53. On that date, Defendant acknowledged receipt of 35,000 Euros and 10,000 Swiss Francs in cash from Paltzer.

54. On or about July 12, 2012, Defendant caused Paltzer to dissolve Daroka Overseas.

55. At the time of account closing, with Defendant's permission, Paltzer withdrew $100,000 in cash from the Bank 1 accounts to hold the funds at Paltzer's office.

56. From in or around 1999 through 2010, Defendant maintained the following balances at year-end in the accounts that he owned and/or controlled:

a. 1999

| ACCOUNT | BALANCE |
|---------|---------|
| Kim Bank Leu (xx-xx3-262 / xx-xxx7770) | $14,246,860 |
| Kim Credit Suisse | $958,059 |
| **TOTAL** | **$15,204,919.00** |

b. 2000

| ACCOUNT | BALANCE |
|---|---|
| Kim Bank Leu | $19,301 |
| Kim Credit Suisse | $5,286 |
| Daroka Overseas Leu | $ 10,525,768 |
| UBS Account | $0 |
| **TOTAL** | **$10,550,355.00** |

c. 2001

| ACCOUNT | BALANCE |
|---|---|
| Kim Bank Leu | $90,248 |
| Kim Credit Suisse | $5,286 |
| Daroka Overseas Leu | $11,606,716 |
| UBS | $0 |
| **TOTAL** | **$11,702,250.00** |

d. 2002

| ACCOUNT | BALANCE |
|---|---|
| Kim Bank Leu | $75,984 |
| Person 1 Bank Leu | $54,571 |
| Daroka Overseas Leu | $5,333,265 |
| Daroka Overseas Hofmann | $4,981,576 |
| UBS | $0 |
| **TOTAL** | **$10,445,396.00** |

e. 2003

| ACCOUNT | BALANCE |
|---|---|
| Kim Bank Leu | $68,093 |
| Person 1 Bank Leu | $55,559 |
| Daroka Overseas Leu | $11,392,870 |
| Daroka Overseas Hofmann | $9,919,430 |
| UBS | $1,436,268 |
| **TOTAL** | **$22,872,220.00** |

f. 2004

| ACCOUNT | BALANCE |
|---|---|
| Kim Bank Leu | $61,876 |
| Person 1 Bank Leu | $55,237 |
| Daroka Overseas Leu | $15,195,111 |
| Daroka Overseas Hofmann | $10,376,631 |
| UBS | $2,462,869 |
| TOTAL | $28,151,724.00 |

g. 2005

| ACCOUNT | BALANCE |
|---|---|
| Kim Bank Leu | $64,144 |
| Person 1 Bank Leu | $1,121,125 |
| Daroka Overseas Leu | $12,374,450 |
| Daroka Overseas Hofmann | $7,395,153 |
| Edraith Bank Leu | $4,763 |
| TOTAL | $20,959,635.00 |

h. 2006

| ACCOUNT | BALANCE |
|---|---|
| Kim Bank Leu | $64,144 |
| Person 1 Bank Leu | $1,191,471 |
| Daroka Overseas Leu | $9,209,461 |
| Daroka Overseas Hofmann | $5,388,020 |
| Edraith Bank Leu | $502 |
| **TOTAL** | **$15,853,598.00** |

i. 2007

| ACCOUNT | BALANCE |
|---|---|
| Kim Bank Leu | $66,493 |
| Person 1 Bank Leu | $722,065 |
| Daroka Overseas Leu | $8,489,387 |
| Daroka Overseas Hofmann | $5,304,964 |
| Edraith Bank Leu | $502 |
| **TOTAL** | **$14,583,411.00** |

j.  2008

| ACCOUNT | BALANCE |
|---|---|
| Kim Bank Leu | $67,658 |
| Person 1 Bank Leu | $431,361 |
| Daroka Overseas Leu | $74,770 |
| Daroka Overseas Hofmann | $4,981,576 |
| **TOTAL** | **$5,555,365.00** |

k.  2009

| ACCOUNT | BALANCE |
|---|---|
| Daroka Overseas Bank 1 | $3,676,363 |
| Edraith Bank 1 | $4,775 |
| **TOTAL** | **$3,681,138.00** |

l.  2010

| ACCOUNT | BALANCE |
|---|---|
| Daroka Overseas Bank 1 | $3,781,882 |
| Edraith Bank 1 | $5,726 |
| **TOTAL** | **$3,787,608.00** |

57.     From in or around 2000 through 2011, Defendant either willfully filed false FBARs that failed to report the financial accounts he owned and/or controlled in Switzerland or failed to file FBARs. For example:

a.     On or about June 14, 2005, Defendant caused to be a filed an FBAR for 2004 on which he reported that he beneficially owned a financial account in South Korea with a balance in excess of $1 million. Defendant failed to report any of the accounts that he owned and/or controlled in Switzerland, including the Daroka Overseas accounts at Bank Leu and Bank Hofmann, the Edraith account at Bank Leu, the account held in his own name at Bank Leu, or the account held in the name of Person 1 at Bank Leu.

b.     On or about October 15, 2006, Defendant caused to be a filed an FBAR for 2005 on which he reported that he beneficially owned a financial account in South Korea with a balance in excess of $1 million. Defendant failed to report any of the accounts that he owned and/or controlled in Switzerland, including the Daroka Overseas accounts at Bank Leu and Bank Hofmann, the Edraith account at Bank Leu, the account held in his own name at Bank Leu, or the account held in the name of Person 1 at Bank Leu.

c.     On or about October 14, 2007, Defendant caused to be a filed an FBAR for 2006 on which he reported that he beneficially owned a financial account in South Korea with a balance in excess of $1,000,000. Defendant failed to report any of the accounts that he owned and/or controlled in Switzerland, including the Daroka Overseas accounts at Bank Leu and Bank Hofmann, the Edraith account at Bank Leu, the account held in his own name at Bank Leu, or the account held in the name of Person 1 at Bank Leu.

d.     On or about March 27, 2008, Defendant caused to be a filed an FBAR for 2007 on which he reported that he beneficially owned a financial account in South Korea with a

balance under $10,000. Defendant failed to report any of the accounts that he owned and/or controlled in Switzerland, including the Daroka Overseas accounts at Bank Leu and Bank Hofmann, the Edraith account at Bank Leu, the account held in his own name at Bank Leu, or the account held in the name of Person 1 at Bank Leu.

      e.      Defendant willfully failed to file FBARs for 2008 through 2011, thereby failing to report any financial accounts he owned and/or controlled in Switzerland. Although for some of the years from 1999-2010, Defendant acknowledged to his accountants that he had bank accounts in South Korea, he knowingly failed to inform his accountants of his ownership and/or control of any bank accounts in Switzerland for any of those years.

58.      From in or around 2000 through 2011, Defendant willfully filed false U.S. Individual Income Tax Returns, Forms 1040, relating to tax years 1999 through 2010, on which he failed to report income from the assets held in foreign financial accounts that he owned and/or controlled in Switzerland. For example:

      a.  On or about, March 27, 2008, Defendant willfully filed a false and fraudulent U.S. Individual Income Tax Returns, Form 1040, for tax year 2007;

      b.  On or about, October 6, 2009, Defendant willfully filed a false and fraudulent U.S. Individual Income Tax Returns, Form 1040, for tax year 2008;

      c.  On or about, October 14, 2010, Defendant willfully filed a false and fraudulent U.S. Individual Income Tax Returns, Form 1040, for tax year 2009; and

d. On or about, November 23, 2011, Defendant willfully filed a false and
fraudulent U.S. Individual Income Tax Returns, Form 1040, for tax year
2010.

59.    From in or around 1998 through in or around 2011, with regard to his undeclared
offshore bank accounts in Switzerland, Defendant conspired with others, including Banker 1,
Banker 2, Buck, and Paltzer.

60.    The acts taken by Defendant in furtherance of the offense charged in this case,
including acts described above, were done willfully and knowingly with the specific intent to
violate United States law. Defendant acknowledges that the foregoing Statement of Facts does
not describe all of Defendant's conduct relating to the offense charged in the information or
described herein, nor does it identify all of the persons with whom Defendant may have engaged
in illegal activities. Defendant further acknowledges that he is obligated under his plea
agreement to provide additional information about this case beyond that which has been
described in this Statement of Facts.

Respectfully submitted,

Dana J. Boente
United States Attorney
Eastern District of Virginia

By:  _____
Mark D. Lytle
Assistant United States Attorney

Stuart M. Goldberg
Acting Deputy Assistant Attorney General
Tax Division

By:  _____
Mark F. Daly
Senior Litigation Counsel
Robert J. Boudreau
Trial Attorney

After consulting with my attorneys and pursuant to the plea agreement entered into this day between me, the defendant, Hyung Kwon Kim, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Hyung Kwon Kim
Defendant

We are Hyung Kwon Kim's counsel. We have carefully reviewed the above Statement of Facts with him. To our knowledge, his decision to stipulate to these facts is an informed and voluntary one.

By:

Mark E. Matthews
Charles Myungsik Yoon
Counsel for Defendant Hyung Kwon Kim